IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RYLINDA RHODES,                          :

    Plaintiff,                           :

v.                                       :
                            Civil Action No. GLR-14-1824
COMCAST CABLE COMMUNICATIONS            :
MANAGEMENT, LLC,
                           :

    Defendant.                           :

                           :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant's, Comcast Cable Communications Management, LLC ("Comcast"), Motion for Summary Judgment (ECF No. 48) and Motion in Limine to Exclude the Affidavits of Karen Davis and Kirby Duffy (ECF No. 49). The Motions are ripe for disposition. Having reviewed the Motions and supporting documents, the Court finds no hearing necessary pursuant to Local Rule 105.6 (D.Md. 2014). For the reasons outlined below, the Court will deny the Motion in Limine and deny in part and grant in part the Motion for Summary Judgment.

## I.   BACKGROUND[1]

Comcast employed Plaintiff Rylinda Rhodes, a female, from May 2007 to August 1, 2012. At all times relevant to this matter, Rhodes was employed as a dispatch representative (also

---

[1] Unless otherwise noted, the following facts are taken from the parties' briefings on the instant Motions, and are viewed in the light most favorable to the nonmoving party.

referred to as "dispatcher").   In 2009, Rhodes began working in Comcast's Network Operations Center ("NOC") in Silver Spring, Maryland.   Upon her arrival, she noticed that the male dispatchers on her team used vulgar language, including profanity, and described various sexual acts and women's body parts.   Some male dispatchers took pictures of her and other female employees' breasts and used a smartphone application to manipulate the size of the breasts in the photos.    Rhodes repeatedly complained to her supervisor, Tim Glass, about the vulgar language, but he assured her that her male coworkers' unprofessional language would stop.   Despite Rhodes's complaints, the behavior continued.

In 2010, Comcast consolidated its regional NOCs and created two NOCs for its mid-Atlantic operations, one in Millersville, Maryland and the other in Richmond, Virginia.   Around April 2010, Comcast transferred Rhodes and the other dispatchers on her team to the Millersville NOC.   Rhodes noticed that the male dispatchers' behavior persisted and she continued to complain to her supervisors about their vulgar language, which included describing sexual acts and calling female customers "bitches." Despite her complaints, the language continued.   In May 2010, Rhodes began applying for different jobs at Comcast.

From June 18, 2010 to October 17, 2010, Rhodes left work on short-term disability leave.   On June 23, 2010, Rhodes was

admitted into Washington Adventist Hospital, diagnosed with bipolar disorder, and began an intensive outpatient program on June 24, 2010.  On October 13, 2010, Rhodes's physician permitted her to return to work part-time with possible discharge from the outpatient program.

In March or April 2011, Rhodes complained to Glass about her coworkers' behavior, and Glass merely stated "what do you want me to do? They are set in their ways."  (Rhodes Dep. at 168, ECF No. 54-2).  Rhodes obtained intermittent FMLA leave from April 10, 2011 to April 9, 2012.  On June 14, 2011, Rhodes applied for a supervisor position in the Millersville NOC, but was rejected for the position.  Rick O'Leary, a supervisor in the Millersville NOC, informed Rhodes that she would not be considered for the position because she was on FMLA leave.

In summer 2011, Rhodes informed her supervisor Laura Kelley that she had bipolar disorder and had weekly meetings with Kelley regarding her male coworkers' use of vulgar language.  In August 2011, Rhodes emailed Quentin Sa'Lay in Comcast's human resources department, stating she made several complaints about unprofessional behavior.  Also, in or around August 2011, one of Rhodes's coworkers, Michael Davis, grabbed her breasts.  Rhodes did not immediately report this incident.

Due to the stress and anxiety caused by her working environment, Rhodes obtained short-term disability leave from

September 21, 2011 to January 1, 2012.  When she returned to work, she confronted Davis and told him never to touch her again.  Rhodes was then absent from work on January 8, 9, 22, 23, 26, 29, and 31, 2012.  In late January or early February 2012, Davis stated to Rhodes, while looking at her breasts, "I missed them girls."  (Rhodes Dep. at 212-13).  Rhodes was then absent from work on February 15, 16, 18, and 21, 2012.

On February 22, 2012, Kelley sent out an email to Rhodes and her coworkers requesting that they refrain from using profanity at work because the human resources department was alerted to the subject matter of their conversations.  Rhodes's last day of work was February 29, 2012, when she went on short-term disability leave from March 1 to May 19, 2012.

On May 22, 2012, Rhodes's insurance company informed her that her medical records confirmed that was no longer considered unable to perform her job and she was released to return to work effective May 20, 2012.  On May 22, 2012, Rhodes contacted Lori Llewellyn, a leave of absence consultant at Comcast, stating she would submit a certification from her healthcare provider substantiating her need for medical leave from May 20, 2012.

On May 22, 2012, Rhodes met with Sa'Lay and informed him that she could not return to the Millersville NOC due to the vulgar language and sexual conversations she repeatedly overheard and the incident involving Davis.  Sa'Lay put Rhodes

4

in contact with Tyra Franklin, the human resources representative assigned to the Millersville NOC.  On May 29, 2012, Rhodes met with Franklin to discuss the vulgar language and incident with Davis.  Franklin informed Rhodes that Comcast would investigate her complaints and the workplace environment would improve.  Rhodes stated she would not return to the Millersville NOC because the environment was detrimental to her health.  Franklin then instructed Rhodes to apply for other positions within Comcast for which she believed she was qualified.  Rhodes requested that she be reassigned to another location or placed in another position comparable to her current position as a dispatcher.

On May 30, 2012, Glass sent an email to various supervisors in the Millersville NOC, including Kelley, stating they must ensure that they maintain a professional environment and keep the employees' personal conversations minimal and appropriate. He further stated that some of Rhodes's complaints to the human resources department were accurate.  Also, on May 30, 2012, Nanette Winder, an employee engagement advisor at Comcast, instructed Franklin to have Rhodes complete Comcast's "Interactive ADA process."  (ECF No. 54-24).

In June 2012, Franklin offered Rhodes a dispatcher position in the Richmond NOC, but Rhodes refused to accept the offer because Comcast would not pay for Rhodes's relocation expenses.

5

Rhodes also refused to return to the Millersville NOC.  On June 1, 2012, Winder began an investigation into Rhodes's complaints. On June 4, 2012, Rhodes again complained to Winder about the inappropriate language and touching that she experienced in the Millersville NOC.  On June 29, 2012, Llewellyn mailed Rhodes a letter stating that if she did not submit a certification form from her healthcare provider by July 6, 2012, Comcast would assume that she was no longer interested in remaining employed and terminate her.

On July 3, 2012, Winder concluded that Rhodes's complaints about Davis could not be substantiated.  Winder told Rhodes the results of the investigation and that she was expected to return to work at the Millersville NOC because Comcast was taking steps to improve the office's environment.  Rhodes then stated that she would never return to the Millersville NOC because she did not feel safe there and she would not accept the position in the Richmond NOC because Comcast would not pay for her relocation expenses.

On July 6, 2012, Rhodes again complained to Winder about the sexual language and misconduct that occurred in the Millersville NOC.  On July 9, 2012, Winder again directed Rhodes to return to work at the Millersville NOC immediately.  On July, 11, 2012, Toni Ekeh, a human resources representative, informed Winder that a termination letter for Rhodes would be drafted.

On July 13, 2012, the human resources department circulated an office etiquette document in the Millersville NOC addressing its expectations for appropriate office behavior.  On August 1, 2012, Comcast terminated Rhodes's employment because of her health and because she refused to return to work.

The following aforementioned facts are in dispute: 1) whether Rhodes made any complaints regarding vulgar and sexual language prior to May 2012; 2) whether Comcast terminated Rhodes because of her health; and 3) whether any employees used vulgar or sexual language in the NOCs.

On June 25, 2012, Rhodes filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  (ECF No. 1).  On March 11, 2014, Rhodes received a right to sue notice from the EEOC.  (Id.).  On June 6, 2014, Rhodes initiated this action against Comcast, alleging hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq. (2012) (Counts I-II); discrimination, wrongful discharge, and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq. (Counts III-V);  interference and retaliation in violation of the Family and Medical Leave Act of 1993 ("FMLA"), as amended, 29 U.S.C. §§ 2601 et seq. (2012) (Counts VI-VII); and discrimination, wrongful discharge, and retaliation under

7

the Maryland Human Relations Act, referred to as the Maryland Fair Employment Practices Act ("FEPA"), Md.Code Ann., State Gov't §§ 20-601 et seq. (West 2016) (Counts VIII–XII). (Id.).

On August 4, 2014, Comcast filed an Answer. (ECF No. 9). On August 31, 2015, Comcast filed Motions for Summary Judgment and in Limine. (ECF Nos. 48, 49). On September 17, 2015, Rhodes filed Oppositions to the Motions. (ECF Nos. 54, 55). On October 13, 2015, Comcast filed Replies to the Oppositions.[2] (ECF Nos. 62, 63).

## II.  DISCUSSION

### A. Standard of Review

Under Rule 56(a), the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

---

[2] In the Motion in Limine, Comcast requests that the Court exclude the affidavits of Karen Davis and Kirby Duffy because Rhodes improperly disclosed the affiants during discovery and did not submit the affidavits until after the close of discovery. (ECF No. 49). On July 21, 2015, the Court extended the deadline for both parties to complete discovery to July 24, 2015. (ECF No. 39). On July 22, 2015—before the close of discovery—Rhodes supplemented her responses to Comcast's request for interrogatories and listed both Davis and Duffy as individuals with personal knowledge of the facts alleged in the Complaint. (ECF No. 55-1). The Court will, therefore, deny the Motion and provide Comcast with thirty days to conduct depositions of Davis and Duffy.

255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970)).   Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."   Anderson, 477 U.S. at 247-48.   A "material fact" is one that might affect the outcome of a party's case.   Id. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).   Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.

## B. **Analysis**

### 1. **Title VII**[3]

#### a. **Hostile Work Environment**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

To prove a claim for hostile work environment based on sexual harassment, a plaintiff must show "that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer."  Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (citing Spicer v. Va., Dep't of Corr., 66 F.3d 705, 710 (4th Cir. 1995)).

---

[3] "FEPA is the state law analogue of Title VII and its interpretation is guided by federal cases interpreting Title VII."  Finkle v. Howard Cty., 12 F.Supp. 3d 780, 784 (D.Md. 2014) (citing Haas v. Lockheed Martin Corp., 914 A.2d 735, 742 (Md. 2007)).  The Court will, therefore, use its Title VII analysis as its analysis for Rhodes' FEPA claims in Counts VIII (hostile work environment) and IX (hostile work environment retaliation).

When determining whether the conduct was based on sex, the crucial issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. at 331 (quoting Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 80 (1998)). A gender-based hostile work environment exists when a woman is subjected to sexual advances, she is the individual target of open hostitliy because of her sex, or harassed in sex-specific and derogatory terms. Id. at 331-32 (citations omitted). Gender-related conduct also includes a plaintiff's "co-workers' discussions about sexual practices." Ziskie v. Mineta, 547 F.3d 220, 227 (4th Cir. 2008). Notably, the Court may consider gender-based conduct not directed at the plaintiff when evaluating a hostile work environment claim because all circumstances are examined. Id. at 224. "Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances." Id. at 224-25 (quoting Jennings v. Univ. of N.C., 482 F.3d 686, 696 (4th Cir. 2007)).

Further, a plaintiff must show that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015). "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a

reasonable person in the plaintiff's position.'" Id. (quoting Oncale, 523 U.S. at 81). Courts also make this determination by looking at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Boyer-Liberto, 786 F.3d at 277 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

"[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation omitted). This standard filters "out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing,'" Ocheltree, 335 F.3d at 333 (quoting Faragher, 524 U.S. at 788), while protecting women from the kind of male attention that makes "the workplace hellish for women," id. (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).

Extremely serious isolated incidents are those which amount "to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788. "In measuring the severity of harassing conduct, the status of the harasser may be a

significant factor—e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'" Boyer-Liberto, 786 F.3d at 278 (quoting Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)).

"The status of the harasser also is relevant to element four of a hostile work environment claim, which necessitates proof that the harassment is imputable to the employer." Id. "[W]here an employee is sexually harassed by a coworker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." Ocheltree, 335 F.3d at 333–34 (quoting Spicer, 66 F.3d at 710).

Comcast argues that Rhodes has failed to present any evidence of a hostile work environment because the disputed vulgar language was not directed towards her; the disputed conduct only involved her co-workers, but no supervisors; and she did not promptly inform Comcast of the disputed conduct. Rhodes has testified that, in 2009, her male co-workers often discussed sexual acts and women's body parts, particularly women's breasts. She stated they took pictures of women's breasts in the office and used a smartphone application to alter the size and shape of the breasts in the pictures. She further testified that one of her male co-workers took a picture of her breasts. Also, Rhodes testified that a male co-worker, Davis,

touched her breasts and, after she told him never to touch her again, commented that he "missed them girls," in reference to her breasts.

Rhodes also testified that her male co-workers would refer to Comcast customers as "bitches." While the derogatory term was not directed toward her, the United States Court of Appeals for the Fourth Circuit has repeatedly rejected the notion that only conduct directed at the plaintiff may be considered. Ziskie, 547 F.3d. at 224-25 (citing cases). Rhodes presents an affidavit from Karen Davis, a former Comcast employee, stating Comcast employees located in Silver Spring and Millersville NOCs made sexual jokes, including jokes about the size of her breasts and propositioned her for sex. Rhodes also includes an affidavit from Kirby Duffy, another former Comcast employee, stating her co-workers in both NOC locations used sexually explicit language, made jokes about her sex life, and described customers as "bitches."

Rhodes testifies, and Davis and Duffy declare, that their supervisors were made aware of the gender-related language used in the NOCs, but failed to take any action to stop it. Rhodes testifies that she informed Comcast of her co-workers' statements in 2009 when she complained to Glass and in 2010 and 2011 when she complained to Glass and Kelley. Ms. Davis declares that one supervisor laughed at the sexual jokes and

remarks and another supervisor made a sexual proposition towards her. Duffy declares the supervisors were aware of the sexual language in the workplace. When considering all of the circumstances, Rhodes has presented sufficient evidence to demonstrate a hostile work environment based on sexual harassment imputable to Comcast.

Comcast, however, presents evidence that it was unaware of the gender-based harassment. Glass, Franklin, and Kelley testified that Rhodes never made any complaints about her coworkers' use of sexual language or sexual advances. Franklin testified that Rhodes only began to make such complaints on May 21, 2012, when she complained to Sa'Lay, and May 29, 2012, when she complained to Franklin. Glass and Sa'Lay testified that vulgar or offensive language was never used in the Millersville NOC. Franklin testified that Comcast's investigation demonstrated that gender-related comments were never made in the workplace and Rhodes's complaint about Davis touching her breasts was unsubstantiated.

Because of the contradictory evidence presented by both parties, the Court finds that there is a genuine dispute as to whether a hostile work environment existed in this matter. The Court will, therefore, deny the Motion for Summary Judgment as to this claim.

### b. Retaliation

Title VII prohibits discrimination against an employee in retaliation for opposing an employer's illegal discrimination practices or participating in Title VII enforcement proceedings. 42 U.S.C. § 2000e-3(a). A plaintiff must establish a retaliation claim under the "burden-shifting" scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). See Vicino v. Maryland, 982 F.Supp.2d 601, 613 (D.Md. 2013) ("Claims of retaliation are governed by the same proof schemes applicable to Title VII discrimination claims, except that proof of retaliation requires but-for causation; the mixed-motive analysis is inapplicable to retaliation claims." (citing EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005))).

To support a claim for retaliation, a plaintiff must demonstrate: (1) "that [s]he engaged in a protected activity," (2) "that the employer took an adverse action against h[er]," and (3) "that a causal relationship existed between h[er] protected activity and the employer's adverse action." Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006) (citing Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004)). A plaintiff first bears the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If a plaintiff

successfully presents a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory justification for its action. Id. (citing McDonnell Douglas, 411 U.S. at 802). Finally, if the employer carries its burden, the plaintiff must show that the employer's legitimate, nondiscriminatory reason is merely a pretext for discrimination. Id. (citing McDonnell Douglas, 411 U.S. at 804).

A protected activity includes opposing unlawful employment practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," including the maintenance of a sexually hostile work environment. 42 U.S.C. § 2000e-2(a)(1); accord Pitter v. Cmty. Imaging Partners, Inc., 735 F.Supp.2d 379, 395 (D.Md. 2010). Title VII protects the right of employees "to complain to their superiors about suspected violations of [the statute]." Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543–44 (4th Cir. 2003).

Though it is not necessary that an employee's underlying hostile work environment claim be meritorious in order to succeed on a retaliation claim, see Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 357 n.1 (4th Cir. 1985), abrogated on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the employee must have an objectively reasonable belief that she is

opposing an unlawful employment practice, see Navy Fed. Credit
Union, 424 F.3d at 406.

Further, "[a] causal connection for purposes of
demonstrating a prima facie case exists where the employer takes
adverse employment action against an employee shortly after
learning of the protected activity." Pascual v. Lowe's Home
Ctrs., Inc., 193 F.App'x 229, 233 (4th Cir. 2006) (quoting
Price, 380 F.3d at 213). Temporal proximity between the adverse
employment action and the employer's knowledge of the protected
activity "gives rise to a sufficient inference of causation to
satisfy the prima facie requirement." King v. Rumsfeld, 328
F.3d 145, 151 (4th Cir. 2003) (citing Williams v. Cerberonics,
Inc., 871 F.2d 452, 457 (4th Cir. 1989)). "Where the time
between the events is too great to establish causation based
solely on temporal proximity, [however], a plaintiff must
present 'other relevant evidence . . . to establish causation,'
such as 'continuing retaliatory conduct and animus' in the
intervening period." Perry v. Kappos, 489 F.App'x 637, 643 (4th
Cir. 2012) (quoting Lettieri v. Equant Inc., 478 F.3d 640, 650
(4th Cir. 2007)).

It is disputed whether Rhodes complained about the use of
sexually-charged language in the Silver Spring and Millersville
NOCs before May 2012. Between September 2009 and September
2011, Rhodes applied to and was rejected for seven positions

18

with Comcast.   The temporal proximity of Rhodes's disputed complaints and Comcast's failure to hire her for one of the seven positions gives rise to an inference of causation.

Though Rhodes's pre-2012 complaints are disputed, it is undisputed that in May, June, and July 2012, she complained about her co-workers' sexually-charged language and being groped by Davis.   After the 2012 complaints, Comcast terminated Rhodes's employment.   The temporal proximity between Rhodes's last undisputed complaints of sexual harassment on July 6, 2012 and her termination on August 1, 2012, gives rise to an inference of causation.[4]   See King, 328 F.3d at 151 n.5 (finding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on

---

[4] Though Rhodes's Complaint includes claims that Comcast terminated her because of her health and because she used FMLA leave, the Court notes that "the McDonnell Douglas framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action." Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015) (emphasis added). Remarkably, neither party makes any mention of the McDonnell Douglas burden-shifting scheme. Neither party discusses whether Comcast had a legitimate non-discriminatory reason for failing to hire Rhodes for the various positions she applied to and for ultimately terminating her. Likewise, neither party discusses pretext.   Because Comcast simply moves for judgment by arguing that no dispute exists as to whether Rhodes has presented a prima facie claim for Title VII retaliation, the Court will not address the remaining steps of the McDonnell Douglas standard.

the basis of temporal proximity).  The Court will, therefore, deny Comcast's Motion as to this claim.[5]

**2. ADA**[6]

### a. Discrimination and Failure to Accommodate

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To prove a failure to accommodate claim, a plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations."  Jacobs v. N.C. Admin.

---

[5] The Court will also deny the Motion as to Rhodes's FEPA claims in Counts VIII (hostile work environment) and IX (hostile work environment retaliation).

[6] FEPA prohibits the same unlawful discrimination as the ADA.  See Lewis v. Univ. of Md., Balt., No. SAG-12-298, 2012 WL 5193820, at *4 n. 3 (D.Md. Oct. 18, 2012) ("Maryland courts have used interpretations of the ADA for guidance when the ADA is substantially similar to the Maryland code at issue." (citing Ridgely v. Montgomery Cty., 883 A.2d 182, 193 (Md.Ct.Spec.App. 2005))).  The Court will, therefore, use its ADA analysis as its analysis for Rhodes' FEPA claims in Counts X (disability discrimination), XI (failure to accommodate), and XII (disability retaliation).

Office of the Courts, 780 F.3d 562, 579 (4th Cir. 2015) (quoting

Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013)).

### i. "Disabled"

The ADA defines a disability as: "(A) a physical or mental

impairment that substantially limits one or more major life

activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment."

42 U.S.C. § 12102(1). Major life activities include, inter

alia, "caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking,

communicating, and working." Id. § 12102(2)(A). Rhodes

presents evidence that she has been diagnosed with bipolar

disorder—a recognized mental impairment which could

substantially limit major life activities.[7]  See Thompson v.

---

[7] Rhodes states in her Complaint that her mental impairments of depression and anxiety substantially limited her ability to eat, sleep, walk, stand, sit, breath, speak, learn, read, concentrate, think, communicate, interact with others, and work. Rhodes, however, presents no evidence that she had difficulty eating, walking, sitting, standing, breathing, speaking, learning, reading, thinking, or interacting with others.

Additionally, though Comcast presents evidence that it never received any certification forms from her health care provider substantiating her medical condition from March 2012 to August 2012, it is disputed that Comcast had notice of Rhodes's mental impairment. Rhodes testifies that she informed Yolanda Jackson, Laura Kelley, and Tony Ekh, Sr. of her disorder in 2011 and 2012. (ECF No. 54-12).

Wakefern Food Corp., No. CV RDB-15-1240, 2015 WL 9311972, at *6
(D.Md. Dec. 23, 2015).

To be substantially limited in her ability to work, Rhodes
must show her mental impairment precluded her "from more than
one type of job, a specialized job, or a particular job of
choice." Pollard v. High's of Balt., Inc., 281 F.3d 462, 471
(4th Cir. 2002) (quoting Sutton v. United Air Lines, Inc., 527
U.S. 471, 491-92 (1999)).  She must show she cannot work "in a
broad range of jobs." Id.  "The inability to perform a single,
particular job does not constitute a substantial limitation in
the major life activity of working." Metro v. Lewis Gale Clinic,
No. 7:01CV00936, 2002 WL 32833260, *3 (W.D.Va. Apr. 26, 2002)
(quoting 29 C.F.R. § 1630.2(j)(3)(i) (2016)).

In this case, Rhodes has not met her burden of establishing
that her mental impairment substantially limits her ability to
work.  Rhodes does not present any evidence of her inability to
perform several types of jobs.  In fact, Rhodes applied, and
sought Comcast's assistance in applying, to various positions at
Comcast in several locations, including the Millersville NOC.
(See ECF No. 54-10).  Also, Rhodes explicitly testified: "I
applied to any and all positions. Anything that would get me out
of the Millersville dispatch location that I was at that was
causing me all the problems." (Rhodes Dep. 235:12-15).  Rhodes
"has not shown, as required, that she is generally foreclosed

from jobs utilizing her skills" because of her bipolar disorder. Rhoads v. F.D.I.C., 257 F.3d 373, 388 (4th Cir. 2001). At most, Rhodes has demonstrated an inability to work in the particular group of dispatch representatives in the Millersville NOC.[8]

Next, Rhodes argues that she has demonstrated a record of a disability. (ECF Nos. 48-12, 48-21, 54-15, 54-17). The medical records state her disorder required partial hospitalization and intensive outpatient treatment, and permitted her to work part-time (ECF No. 54-15); and her disorder was considered a chronic condition that required her intermittent absence from work from April 10, 2011 to April 9, 2012 (ECF No. 54-17). The record also reflects that Rhodes was released to return to work effective May 20, 2012. (ECF No. 48-10).

Because Rhodes argues Comcast discriminated against her from late May 2012 to August 1, 2012—after she was medically able to return to work—by failing to fulfill her requested

_____

[8] Though Rhodes contends her bipolar disorder has substantially limited other major life activities like concentrating and thinking, she does not provide any evidence distinguishing her limitations from the general population. See 29 C.F.R. § 1630.2(j)(1)(ii) (2016) ("An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."). The Court also notes, Rhodes repeatedly testified that these limitations were triggered and aggravated solely by her workplace environment—namely, the disputed hostile work environment based on sexual harassment. (See, e.g., Rhodes Dep. 55: 8-16; 58:1-7; 59:2-6; 59:21-60:5; 93:5-10; 124:1-5, 148:2-4; 151:20-153:3; 164:11-20;173:3-174:13; 206:13-21; 233:2-7;235:11-15).

accommodations of employing her in another position in Comcast or paying for her relocation to Richmond and by terminating her, Rhodes has failed to demonstrate a record of disability at the time of the alleged discrimination.   The Court, therefore, concludes that Rhodes has failed to sufficiently demonstrate that she was actually disabled or had a record of disability under the Act.[9]

### ii. Failure to Reasonably Accommodate

Even assuming Rhodes could demonstrate that she was disabled under the ADA, she cannot demonstrate that Comcast failed to reasonably accommodate her disability.   A reasonable accommodation may include "job restructuring, part-time or

---

[9] Rhodes does not argue that Comcast regarded her as disabled under the Act.   To satisfy this definition of disability, Rhodes must demonstrate that Comcast mistakenly believed she had a mental impairment that substantially limited her ability to concentrate, communicate, or work.   Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 153 (4th Cir. 2012) (quoting Sutton, 527 U.S. at 489, 119 S.Ct. 2139).   Rhodes presents evidence that Comcast was aware that she was placed on short-term disability leave from September 21, 2011 to January 3, 2012 and March 1, 2012 to May 19, 2012.   (ECF Nos. 54-10, 54-16). The record also demonstrates that Comcast sought to have her complete its "Interactive ADA process" on May 30, 2012—ten days after she was medically able to return to work.   (ECF No. 54-24).   In fact, Comcast offered to reassign Rhodes as an accommodation in June 2012.   (ECF No. 54-12).   Such evidence could support a jury finding that Comcast regarded her as disabled in that it believed her mental impairment substantially limited her in her ability to work.   Nevertheless, a covered entity "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as prong."   29 C.F.R. § 1630.2(o)(4).   Rhodes, therefore, cannot sustain an ADA failure to accommodate claim by demonstrating that Comcast regarded as disabled.

modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). An accommodation is reasonable "unless [the employer] can demonstrate that the accommodation would impose an undue hardship." Id. § 12112(b)(5)(A). The plaintiff has the burden of identifying an accommodation that would allow a qualified individual to perform the essential functions of a job and the burden of persuasion with regard to demonstrating that such an accommodation is reasonable. Lamb v. Qualex, Inc., 33 F.App'x 49, 56 (4th Cir. 2002) (citing Halperin v. Abacus Tech. Corp., 128 F.3d 191, 199 (4th Cir. 1997), abrogated on other grounds by Baird ex rel. Baird v. Rose, 192 F.3d 462 (4th Cir. 1999)).

A plaintiff is qualified if she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "A regular and reliable level of attendance is an essential function of one's job." Lamb, 33 F.App'x at 56 (citing Halperin, 128 F.3d at 199. "[A]n employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209, 213 (4th Cir. 1994) (quoting Wimbley v. Bolger, 642 F.Supp. 481, 485 (W.D.Tenn. 1986)). "An employee who cannot meet the attendance requirements of the job at issue

cannot be considered a "qualified" individual protected by the ADA." <u>Lamb</u>, 33 F.App'x at 56-57 (citing <u>Tyndall</u>, 31 F.3d at 213).

Comcast employed Rhodes as a dispatcher.  The position required "regular, consistent, and punctual attendance."  (ECF No. 48-5).  It is undisputed that Rhodes took unapproved breaks (Rhodes Dep. 208: 9-19, ECF No. 54-2) and was on unapproved leave from May 20 to August 1, 2012.  It is also undisputed, however, that Rhodes's poor attendance stemmed from the stress and anxiety she experienced due to the working conditions at the Millersville NOC.  Rhodes argues that she could perform the essential functions of the dispatch representative position with reasonable accommodations, specifically (1) enforcement of Comcast's sexual harassment policies in the Millersville NOC, (2) an expense-paid relocation to another NOC, or (3) reassignment to a different position within Comcast.

"[A]n employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation." <u>Crabill v. Charlotte Mecklenburg Bd. of Educ.</u>, 423 F.App'x 314, 323 (4th Cir. 2011) (quoting <u>Crawford v. Union Carbide Corp.</u>, 202 F.3d 257 (4th Cir. 1999)).  The record demonstrates that Comcast attempted to meet Rhodes's first requested accommodation.  On May 30, 2012, Glass instructed Kelley to maintain a professional

environment among the dispatchers on her team and ensure that personal conversations are kept minimal and appropriate because some of Rhodes's complaints were accurate. Also, on July 11, 2012, Comcast reissued its office etiquette policy to the dispatchers in the Millersville NOC. Lastly, Comcast conducted an investigation into Rhodes's complaints about unprofessional behavior and sexual harassment among the dispatchers in the Millersville NOC, but found her complaints to be unsubstantiated. When instructed to return to work at the Millersville NOC, Rhodes flatly refused.

Additionally, in June 2012, Comcast attempted to transfer Rhodes to a vacant dispatcher position in the Richmond NOC, but Rhodes refused the accommodation because she preferred to have Comcast pay for her relocation expenses. Comcast was not obligated to pay for Rhodes's relocation expenses; its offer to relocate her to the Richmond NOC provided Rhodes with some reasonable accommodation. Lastly, Comcast was not required to reassign Rhodes a different position within the company unless she was qualified for the position. "'[Q]ualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires . . . ." 29 C.F.R. §

1630.2(m).  Rhodes fails to identify <u>any</u> positions for which she was qualified.

In sum, Rhodes could not perform an essential duty of her position as a dispatcher—maintaining regular, consistent, and punctual attendance.  The Court, therefore, concludes Rhodes cannot sufficiently demonstrate that she was a qualified individual with a disability under the Act or that Comcast failed to provide her with a reasonable accommodation.[10]

### b. Wrongful Discharge

To prove a wrongful discharge claim, a plaintiff must prove "(1) [she] is within the ADA's protected class; (2) [she] was discharged; (3) at the time of [her] discharge, [she] was performing the job at a level that met [her] employer's

---

[10] To the extent Rhodes attempts to argue Comcast failed to engage in an interactive process with her to identify potential reasonable accommodations, she cannot base her claim solely on this allegation.  <u>Walter v. United Airlines, Inc.</u>, No. 99-2622, 2000 WL 1587489, at *5 (4th Cir. Oct. 25, 2000) (citing <u>Rehling v. City of Chicago</u>, 207 F.3d 1009, 1016 (7th Cir. 2000)). "[S]he also must show that this failure to engage in the process resulted in the failure to find an appropriate accommodation." <u>Fleetwood v. Harford Sys. Inc.</u>, 380 F.Supp.2d 688, 701 (D.Md. 2005).  The record demonstrates that Comcast attempted to reassign her to the Richmond NOC, but she refused. Additionally, the record demonstrates Rhodes repeatedly indicated that she would never return to the Millersville NOC regardless of Comcast's efforts to reinforce its harassment and office etiquette policies in that location.  Lastly, Rhodes failed to even identify any different vacant positions within Comcast for which she was qualified.  The Court, therefore, concludes that Rhodes has failed to demonstrate the Comcast's purported failure to engage in an interactive process was unlawful.

legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001) (citing Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, 53 F.3d 55, 58 (4th Cir. 1995)).

A plaintiff must "first establish that [s]he is a 'qualified individual with a disability' under the ADA." Shin v. Univ. of Maryland Med. Sys. Corp., 369 F.App'x 472, 479 (4th Cir.2010) (citing Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 (4th Cir. 2004)). As previously stated, Rhodes has failed to demonstrate that she is a qualified individual with a disability. As such, the Court will grant Comcast's Motion as to this claim.

### c. Retaliation

The ADA provides that "[n]o person shall discriminate against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a) (emphasis added). "Given that the ADA's anti-retaliation provision is identical to Title VII's, the standard laid out by the Supreme Court for purposes of Title VII controls in this ADA case." A Soc'y Without A Name v. Virginia, 655 F.3d 342, 352 (4th Cir. 2011). "In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-

shifting method." <u>Rhoads</u>, 257 F.3d at 391.   A plaintiff can produce evidence including conduct or statements that directly reflect "the alleged discriminatory attitude and that bear directly on the contested employment decision." <u>Id.</u> (quoting <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598, 606–07 (4th Cir. 1999)).

Alternatively, under the burden shifting method, "[t]o establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) [she] engaged in protected conduct, (2) [she] suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." <u>Reynolds v. Am. Nat. Red Cross</u>, 701 F.3d 143, 154 (4th Cir. 2012).   A plaintiff need not establish that the conduct she engaged in was actually protected under the ADA violation, but she must have a reasonable and good faith belief that her conduct was protected. <u>Freilich v. Upper Chesapeake Health, Inc.</u>, 313 F.3d 205, 216 (4th Cir. 2002) (citations omitted).

Rhodes does not present any arguments regarding her ADA retaliation claim in her Opposition.   In the Complaint, Rhodes demonstrates that she engaged in protected activity when she informed Comcast of her mental impairments and requested reasonable accommodations in May 2012.   Though Rhodes cannot demonstrate that she is a qualified individual with a disability under the ADA, a jury could find that she had a reasonable and

30

good faith belief that her request for an accommodation—i.e., relocation or reassignment—was protected under the Act. The record shows that Rhodes's termination was temporally proximate to her request that Comcast accommodate her perceived disability.[11]

Additionally, Rhodes presents direct evidence that she was terminated because of health: Comcast's records state Rhodes was involuntarily terminated because of her health. (ECF No. 54-27). The record also demonstrates, however, that Comcast did not terminate Rhodes because of her health. (ECF No. 54-9) (stating Rhodes was not terminated due to her health). The Court, therefore, concludes that a genuine dispute exists regarding whether Comcast terminated Rhodes because of her health. Accordingly, the Court will deny Comcast's Motion as to this claim.[12]

---

[11] The Court notes that the McDonnell Douglas burden-shifting scheme applies to appropriate claims brought under the ADA. Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995), as amended (June 9, 1995), as amended (Mar. 14, 2008). Much like the Title VII retaliation claim, the parties do not engage in any burden-shifting analysis discussing whether Comcast had a legitimate non-discriminatory reason for terminating Rhodes or whether said reason was pretextual. Because Comcast simply moves for summary judgment by arguing that no dispute exists as to whether Rhodes has presented a prima facie claim for ADA retaliation, the Court will not address the remaining steps of the McDonnell Douglas standard.

[12] Because Rhodes has failed to demonstrate claims for discrimination, failure to accommodate, and wrongful discharge, the Court will also grant Comcast's Motion as to Counts X (disability discrimination and wrongful discharge) and XII

31

### 3. FMLA

#### a. FMLA Interference

Under the FMLA, eligible employees are entitled to "a total of 12 workweeks of leave during any 12-month period" for certain health or family reasons. 29 U.S.C. § 2612(a)(1). An employer violates the Act when it "interfere[s] with, restrain[s], or den[ies] [an employee's] exercise or attempt to exercise" her FMLA rights. Id. § 2615(a).

To state a claim for unlawful interference with an entitlement to FMLA benefits, an employee must allege that: "(1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled." Rodriguez v. Smithfield Packing Co., Inc., 545 F.Supp.2d 508, 516 (D.Md. 2008) (citing Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir. 2006)). An eligible employee is one who has been employed by the covered employer for at least 12 months, for at least 1,250 hours of service during the 12-month period immediately preceding the start of the requested leave, and at a worksite where 50 or more employees are employed

---

(failure to accommodate). The Court will, however, deny the Motion as to Count XIII (disability retaliation).

by the employer within 75 miles of that worksite.  29 C.F.R. § 825.110(a) (2016).

Rhodes presents absolutely no evidence regarding her eligibility for FMLA benefits, that she was entitled to leave under the Act, or that Comcast denied any FMLA benefits to which she was entitled.  The Court will, therefore, grant Comcast's Motion as to this claim.

### b. FMLA Retaliation

FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and are analyzed under the McDonnell Douglas burden-shifting framework.  See Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001).  Thus, to succeed on her retaliation claim, Rhodes must make a prima facie showing "that [she] engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to [her] protected activity."  Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998).

It is undisputed that Rhodes engaged in protected activity by taking intermittent FMLA leave from April 10, 2011 to April 9, 2012.  (ECF No. 54-17).  It is also undisputed that Rhodes applied and was rejected for a supervisor position in June 2011. Rhodes testified that her supervisor Rick O'Leary informed her that she would not be considered for the position because she

had taken FMLA leave in June and July 2011. While on intermittent leave, Comcast issued a written warning to Rhodes regarding her attendance during January and February 2012. After Rhodes's FMLA leave expired on April 9, 2012, Comcast terminated her on August 1, 2012. The Court, therefore, finds that Rhodes has presented sufficient evidence to support this retaliation claim. As such, the Court will deny Comcast's Motion as to this claim.

### III. CONCLUSION

For the foregoing reasons, Comcast's Motion for Summary Judgment (ECF No. 48) is DENIED in part and GRANTED in part. Counts III, IV, VI, X, and XII of the Complaint (ECF No. 1) are DISMISSED and judgment is entered in favor of Comcast for these Counts. Comcast's Motion in Limine to Exclude the Affidavits of Karen Davis and Kirby Duffy (ECF No. 49) is DENIED. Comcast shall be permitted thirty days to depose Ms. Davis and Duffy. A separate Order follows.

Entered this 17th day of August, 2016

/s/

_____
George L. Russell, III
United States District Judge

34